The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning. Please be seated. Welcome to the Fourth Circuit. We're pleased to be joined this morning by our colleague, Judge Rushing, who has survived all the problems that Asheville, North Carolina, has had recently. So she'll be on screen and if you hear Judge Rushing speak or raise your hand, the lawyers will stop so she can ask a question. We'll take up our first case, Amazon v. W.C. Holdings. Mr. Hunger. Thank you, Your Honor, and may it please the Court. The District Court's decision should be reversed and the case remanded for trial on Amazon's RICO, fraud, unjust enrichment, conversion, and conspiracy claims. On RICO and fraud injury, the law is clear that a jury can infer damages in the amount of the kickbacks paid to corrupt employees in a commercial bribery case. As the Dobbs Treatise explains, it may be assumed that the briber would have sold at a lower price if he had not had to pay the bribe. Sir, are you arguing for a per se rule where kickbacks are involved or is that separately a matter of proof? It's a matter of proof, Your Honor. We didn't move for summary judgment, but the District Court of course granted summary judgment against us and our point is the evidence in a commercial bribery case where it's shown, where there's evidence from which the jury can find that a bribe was paid in order to steer a contract to the bribe payer, that it's a reasonable basis for the jury to conclude based on the fact that the bribe was paid that the bribe payer got at least that amount of benefit out of the fraud. And therefore, there may be other evidence from which additional damages could be found, but that's certainly a reasonable basis for the jury. So is your method of proof here that you would have an expert testify as to the differential in value, not based, for instance, on a real estate appraisal, but based on other economic factors? Well, the expert, as we've cited in our brief, our damages expert does opine in this case that the bribes resulted in damage to Amazon because, but for the bribes, Amazon would have been able to do the transactions at a lower price. But again, the rule of law that we're articulating and identifying in the cases, and this is not just the Dobbs Judas, this court has recognized it in cases involving Maryland law in the Western Contracting case. Other circuits have recognized it in the cases that we've cited in our briefs, including the Continental case and the Williams against Garrity case. The Virginia courts have recognized it in the Millborough case and the Jordan case and the Byrd case. Am I correct here that the district court's decision was based on its finding that Virginia law required, in essence, appraisals of real estate values as opposed to any other kind of form of proof? Yes, it adopted a categorical rule that that's kind of required across the board in any fraud case. And that's the rule in a case where you buy a house and the representation was the roof doesn't leak, and in fact it does. But that's a very different scenario from a commercial bribery case. And in the commercial bribery context, Millborough and Jordan from the Virginia Supreme Court and the Byrd case from the circuit courts that we cite in our briefs all support the proposition that the bribe can be recovered and is an appropriate consideration in assessing damages and finding injury. And that's why we're asking for the court to send this back for trial so that the jury can consider the evidence and conclude based on all these principles of common sense and case law that an injury exists here. Separate and apart from the kickbacks, which we believe in and of themselves establish injury and therefore require reversible dissumary judgment, it's also the case that there is specific evidence of ways in which the fraudulent conduct of Nelson and Kirshner and the other defendants inflated the costs that Amazon ended up paying. For instance, there's evidence, as we detailed in our brief, that they inflated the lease fees on the transactions in order to fund the kickbacks. But for the fraud, of course, there would have been no basis for employees of Amazon to be trying to inflate Amazon's costs had they been doing their duty instead of breaching their duty of loyalty. Those are injuries to Amazon. Unquestionably, the defendants don't even respond to that evidence in their brief. So that, again, standing alone, requires reversal here. We also identified in our brief the rebates that were owed to Amazon from the broker on these transactions but were instead transferred to the defendants. The only response the defendants offered to that is nothing on the merits, but rather they claim they didn't know about this in time to respond. That's simply not true, as we showed at pages 29 and 30 of our opening brief. Amazon's supplemental disclosures specifically identified the amounts of kickbacks and funds transferred to Northstar, the fraudulent developer entity, those full amounts that Amazon was seeking to recover. Those amounts unquestionably include the $700,000 or so in rebates. Similarly, Amazon identified in its supplemental disclosures the $5.1 million transferred from Northstar to Villanova, the fraudulent entity set up to launder the proceeds. And that money unquestionably includes the $700,000 in rebates that we're seeking. They knew about that at the time, well before discovery closed. And we know they knew about it because after they received those supplemental disclosures, they saw discovery on the very rebate issue that we're talking about. So there's no question they knew about it. There was no prejudice or harm and therefore no basis for excluding that evidence. Turning to the Ricoh Enterprise issue, if the court has no further questions on damages, the district court committed a reversible error in relying on the hub and spoke concept, which does not apply in the enterprise, to the Ricoh Enterprise setting. In fact, as this court recognized in the Griffin case, the whole point of the Ricoh Enterprise concept was to be easier to prove than a conspiracy. And both the Fifth Circuit and the Third Circuit have expressly rejected the notion that the hub and spoke or rimless wheel concept governs the enterprise. And in any event, even if it did apply here, which it doesn't, it would be satisfied. This is a far cry from what this court described in the Dixon case as a hub and spoke or rimless wheel conspiracy, namely one where the spokes have no connection with one another, but only separate agreements with one common defendant. Here, most of the defendants were involved in all of the 11 transactions, the fraudulent transactions at issue. Nelson, Kirshner, Atherton, and the Watson defendants. The Watson defendants admit they were involved in 9 of the 11. We believe they were involved and allege and have evidence that they were involved in 10 of the 11 since the 10th is the White Peaks transaction in which Mr. Watson pocketed $5 million on the theory that his employees had engineered that transaction. So it seems quite clear that there's a basis for connecting them to that as well. So when all of the defendants before the court were involved in the vast majority of the transactions engineered by the enterprise, this is a far cry from a rimless wheel conspiracy. And the district court's ruling on that issue should be reversed as well. Turning to the conspiracy issue, the district court dismissed the conspiracy claims against the corrupt lawyer Atherton on the theory that he was acting merely as a lawyer and therefore the intracorporate conspiracy doctrine or a single entity rule barred conspiracy liability. But of course... Are you going to address the unjust enrichment and conversion claims? Yes, Your Honor. I'm happy to address those. With respect to those claims, we think this court's prior decision in the earlier appeal in this case compels rejection of the district court's reasoning which was that legal remedies are adequate therefore the equitable claims can proceed. That same argument was rejected last time around. So did the district court violate the mandate rule here? We think it did, yes, Your Honor, as to those equitable claims against the Watson defendants. And the principle of this court's ruling last time around applies to all the defendants before the court. But even aside from that, even putting aside the mandate rule, the district court's ruling was just wrong on the merits. We don't have to make an election until we see what the verdict is to determine whether legal or equitable remedies are more appropriate. And in fact, our equitable claims for relief are larger in monetary terms than the legal damages claims. So as a matter of law, it's erroneous to say that our legal remedies are adequate. The defendants argue that there are contractual bars to equitable relief here on the unjust enrichment claim, but that's simply not true. The Watson defendants aren't parties to the lease agreements. They weren't parties to the lease agreements even in the beginning. We originally sued them only on an alter ego theory, which they denied, and those claims are no longer in the case. They can hardly hide behind a contract that they denied being bound by, and this court so ruled in the previous appeal. And as for the agreements with the corrupt employees, those agreements don't cover the subject matter of this case at all. They were limited to specific confidentiality and non-competition provisions at the district court. Let's go back to the attorney criminal activity. What authority is there that would say that an attorney that engaged in criminal activity, how can he still be an agent? Is there authority for that? None that I'm aware of, Your Honor. The authorities are quite clear in Virginia and elsewhere that for that doctrine, the inter-corporate conspiracy doctrine to apply, the agent has to be acting within the scope of the legitimate bona fide agency relationship. Here, the allegations are and the evidence is that Atherton was engaged in money laundering, hiding the proceeds of the illicit activities and funneling them through a bunch of shell corporations and entities in order to deceive everyone and conceal the fact that Amazon employees were getting kickbacks on Amazon deals that they arranged. That's a far cry from legitimate legal representation. And in fact, as this court said in the United States against Farrell, that's precisely the kind of situation where a lawyer is liable as a conspirator. The court said, a lawyer representing or advising a criminal entity can readily turn himself into a co-conspirator in the form of a consigliere or fixer. That's precisely what Atherton was doing here. And therefore, the district court's rejection of conspiracy liability for him on the ground that he was a lawyer is simply wrong because the whole theory of the case is he was not acting as a lawyer. He joined in the frauds as a co-conspirator, engaging and facilitating in illegal activities. So is it your argument that there's a factual dispute here about his capacity? Yes, Your Honor. Exactly right. And the Virginia Supreme Court in the Fox case and the circuit court in the PGS case that we cite recognize that in those circumstances, a trial is necessary to resolve the question whether the attorney was acting or the agent was acting within the scope of his alleged agency. So for all those reasons, we ask that the judgment of the district court be reversed and the case remanded for trial. If the court has no further questions. All right. Thank you. You've got some rebuttal time. Thank you. Mr. Hudson. Good morning and may it please the court. This case is about 11 real estate transactions, 9 leases and 2 direct purchases that Amazon carefully evaluated that were made at competitive fair market rates and that Amazon affirmed and has never sought to rescind. The operative complaint Amazon was for. I thought Amazon went back and basically redid all the leases and took North Star or some of the other defendants off of them. There are two relevant contracts I think you're referring to, Your Honor. The first was a lease continuity agreement that did affirm the leases. That was in 2020. And then a year later in December 2021, Amazon unilaterally, without North Star's participation, amended the leases. But importantly, and this is the critical point, Amazon has never sought to rescind the leases or any of the other transactions, even though that is an appropriate remedy. So why would they need to do that? Why would they need to rescind the leases? Why is that important to your argument? Because, Your Honor, if they believed that the leases were at unfair rates, that they were paying too much, they were deceived by their employees into overpaying, then they could have sought to rescind them. And indeed, they discovered this before they started making payments in almost all of the leases. Well, here, wouldn't the same effect be arranged if they got the damages that revised leases would have given them from your clients? I'm sorry. I'm not following your question, Your Honor. Well, I mean, instead of revising the lease, the amount they think they overpaid, they're suing your clients for. That's right, Your Honor. That's exactly right. And that is the allegation they made in the operative complaint, that they overpaid for all of these transactions. And when this case reached the summary judgment stage, the district court concluded that Amazon completely failed to substantiate their allegations in their operative complaint. First, the district court found that Amazon doesn't dispute on appeal, that Mr. Watson had no involvement with the direct purchases. Nor did Amazon provide any evidence that it overpaid in any of the transactions. It even admits that it presented no evidence of any of the transactions' fair market value. I thought your opposing counsel said it had expert witness testimony that did demonstrate they had overpaid. Your Honor, Amazon has no expert witness testimony. Amazon's expert witness repeatedly and explicitly testified that he was not offering an opinion on damages. Quote, I'm not offering any opinion on damages, period. That's Joint Appendix 3287. I was not asked to opine on Amazon's recoverable damages at all. That's Joint Appendix 2433. I'm not opining on Amazon's damages related to any account. Joint Appendix 3291. Isn't an expert to opine on damages kind of a different question, isn't it, than whether they have substantiated an injury, right? I thought the district court said there was no evidence from which a jury could find Amazon had been injured in its business or property, and that's why it was thrown out, not that they hadn't put forward a proper damages expert. That's correct, Your Honor. There is a potential distinction, at least in some cases, between the existence of an injury and damages, although oftentimes the evidence will overlap substantially. And you're right. In this case, the district court concluded Amazon failed to provide any evidence from which a jury could reasonably conclude that Amazon was injured, as is required by the civil RICO statute and their Virginia law fraud claim. And the district court said, one, I have no expert evidence on this question because the expert said I'm not testifying to whether they overpaid. I thought the district court said there was not evidence of injury because evidence of fair market value is required, not that the expert claims to be saying nothing, but that the expert wasn't relying on fair market value. No, Your Honor. The critical point for the district court, there are, I think, two points here. One, with respect to the expert, the district court concluded the expert simply doesn't speak to this question. The expert's report simply traces the path of funds, which is fine. That's an appropriate rule for the expert. But the expert did not testify about overpayment because, of course, the expert couldn't testify about the fair market value. The expert declined to do so. Nor, critically, did the expert testify about causation, that the referral fees caused higher rates than would otherwise be the case. The expert did not testify to that. There's no basis in the expert's report for that conclusion. So the district court said, okay, we don't have expert evidence. Okay, so what other evidence do we have? And my friend on the other side. So your position is that the jury could not infer an injury from the kickbacks? Yes, that is correct, Your Honor. And that conclusion is required by this court's decision in Behr v. Craig-Northrup, which was at a motion-to-dismiss stage, which is all the more the case. So in Behr v. Craig-Northrup, there were alleged kickbacks. The title insurance company allegedly paid kickbacks in the form of marketing fees to the real estate brokerage. And the complaint alleged that that caused them to pay more than they otherwise would. And the court said there are no specific allegations. The existence of the kickbacks themselves don't make it plausible that you paid more than you otherwise would. And that's at the motion-to-dismiss stage. We're not talking about just a complaint here. There's evidence in the record about, you know, they're pointing out the rebates, this other evidence. There's a lot more going on than just an allegation. Can you address that? Yes, Your Honor, thank you. So I think it's helpful to break this up into three pieces. So one, we have the suggestion, the argument that you just referred to, that the kickbacks themselves are ifso facto evidence that would allow a jury to find an injury. And Behr forecloses that notion. Because if that were the case, Behr would have come out differently. He would have at least made it plausible, the existence of the kickbacks in the Behr case, to create an injury for Article III purposes. So Behr, I think, forecloses that notion. Then we have the rebates. And the district court properly concluded that Amazon forfeited its reliance on those rebates. The Amazon was aware of them from the beginning. They did not allege anything about them in the complaint, nor did they raise anything about them in their Rule 26 disclosures. And the important thing, I think, on the rebates is to recognize the rebates are not simply another form or an expansion of, say, consequential damages. This isn't a fender bender where the plaintiff says, oh, I initially thought it was just my shoulder, but it's actually my back, too. That's not the situation here. The rebates involve entirely new potentially wrongful conduct. And, for example, the rebates are only a valid form of injury if Amazon was actually entitled to those rebates. And it's still not clear to me, even now on appeal, what the source is of that legal entitlement. Is it a written contract? Is it an oral understanding between Amazon and the broker? It's still not clear. And certainly Amazon didn't allege anything like that in its complaint. And this court has been consistently clear that a party is not entitled to unilaterally amend its complaint by raising new theories and new facts in its summary judgment opposition. So that's the rebates. So now we have what I think is the final category of evidence that Amazon relies on, which are a few internal messages between Mr. Watson and some of his employees. And the critical thing is those emails or messages simply discuss Mr. Watson's negotiating strategy. Like, what do we think? And, again, those are with non-Amazon employees for the most part, Mr. Ramsey there. And those are just about, well, what do we think, how should we charge Amazon, what is the amount? None of that evidence, and this is a critical point, draws a connection between the referral fees and higher prices. And so this gets to the question that Judge Agee asked my friend on the other side, and that is, is there a per se rule here? And we're not asking for a per se rule either. There's lots of evidence that a plaintiff could potentially use to establish damages in a kickback case. The plaintiff could point to, Amazon could have pointed to, its own internal transactions. How do these leases compare to its other leases with other counterparties? It had all of Northstar's evidence. It could have looked at other Northstar transactions. It could have had an expert. It could have looked at internal documents that actually do show a connection between the kickbacks and higher costs. And in many kickback cases, and say in the municipal context, there are oftentimes cost plus contracts where any additional cost automatically, by operation of the contract, increases the price that the purchaser paid. That's not what we have here. These are maximum gross price contracts where Amazon's paying the rent number period, regardless of how much it ultimately costs Northstar to do the build the suit transaction. And then the last point I'll make on the damages piece, Your Honor, is none of the evidence, the messages that Amazon cites. Wasn't there evidence that these kickbacks entered into the computation for what the rental amount was? No, Your Honor, there is no evidence of that, and that's the critical point. The evidence they have is Mr. Watson included items in the budget, so say a 2% lease fee. And that's very common. Amazon doesn't dispute that that's very common. And all of those are visible to Amazon. It can see it in the budget. And then a yield, a percentage is applied to that total budget, and that produces the bottom line rent payment. And that's what Amazon pays. But if the kickback amounts are included in some of those components, why wouldn't that be sufficient proof, at least for summary judgment purposes? Precisely, Your Honor. If Amazon could show that the referral fees were increased, the existence of the referral fees increased, say, the 2% leasing fee, if they had evidence that Mr. Watson... What happens if the referral fee was 1% but the kickback bumped it up to 2%? Precisely, Your Honor. I think that's right. That's precisely the evidence that Amazon needs, and that's precisely the evidence they don't have. It's speculation. We know that referral fees were paid, but we don't know that the existence of the referral fees actually increased any dollar amount in these contracts. We just don't have it. Isn't that part of what the expert says? He says if the scheme did not exist, Northstar wouldn't have had to charge these fees and could have made the same profit, and so the overall lease budget would have been lower and Amazon's rent would have been lower. Your Honor, first of all, the expert later disclaimed any opinion on this notion. Two, that's speculation. We have no dispute with the general notion that the payment of referral fees, the payment of kickbacks, can, in some instances, increase the price that the buyer pays. But what Amazon needed at summary judgment was specific evidence establishing that point. And the last point I'll make on the damages piece, on the RICO injury piece, is none of the evidence that Amazon cites has anything to do with the purchases. All of the messages that they cite refer to the leases. So at the very least, they failed to prove any civil RICO claims or fraud claims after the leases. And then the final thing on the fraud claim, Amazon doesn't dispute that its fraud claim is subject to a higher evidentiary standard, clear and convincing evidence. So even if the Court thinks that Amazon has squeaked past the line to establish injury on its civil RICO claim, it has not done so. The district court properly concluded it failed to do so on its fraud claim. And in addition, as we pointed out in our brief, Amazon forfeited any arguments as to its fraud claim because it didn't respond to this point at all in its summary judgment opposition. The district court correctly found that. And this is not just, oh, a ticky-tacky, well, you should have repeated these arguments in the fraud section of your summary judgment brief. The fraud claim has a different source of law and a different evidentiary standard. And Amazon needed to address that standard in its summary judgment brief, and it failed to do so. So turning very briefly to, unless the Court has any questions on Enterprise, I'll turn to the equitable claims. Amazon does not argue, I think correctly, that this Court's preliminary injunction opinion has any effect on its equitable claims as to Mr. Nelson and Mr. Kirshner. They weren't parties in that appeal, of course. They weren't parties in the case at that time. And, of course, the Court had no occasion to address the significance of their employment agreements, the CNIAAs, on Amazon's equitable claims. And Amazon now says that their employment agreements had nothing to do with the subject matter of this case. But that's not Amazon's, that hasn't been Amazon's position. Amazon raised a breach of contract claim in this case. Well, I thought the district court's ruling was that you have a claim for damages, therefore you cannot make a claim for unjust enrichment or conversion. That was one theory the district court raised, Your Honor, and we have not pressed that theory on appeal. If you had, that would appear to directly violate the mandate rule. At least with respect to Mr. Watson, Your Honor. I think that's fair, yes. But we aren't pressing that argument. I think the direct argument here arises directly from the Virginia Supreme Court's recent decision in the James G. Davis construction case. It's a clear rule of law. When the existence of an express contract covering the same subject matter of the party's dispute precludes a claim for unjust enrichment. And the Virginia Supreme Court, in announcing that rule, expressly adopts the position of the restatement. And Amazon relies on a single exception to this rule, which is whether or not the contract covers the same subject matter of the party's dispute. And the restatement is crystal clear that that exception is not triggered simply because the plaintiff lost their breach of contract claim. It's not as if, under the restatement's approach, if you bring a breach of contract claim and you lose, well, then you can rely on equitable theories. That's not the restatement's approach, and there's a good reason for that. As this court recognized in the Raymond Kolsar case from 1992, in recognizing the Virginia Supreme Court's rule on this point, parties to an express contract are entitled to have their rights and duties adjudicated exclusively by its terms. Mr. Nelson and Mr. Kirshner had contracts with Amazon. They specified their obligations. Did they cover bribes and kickbacks? They did not. The district court concluded that they did not cover bribes and kickbacks, and it ruled against Amazon on its breach of contract claim. Amazon previously argued that it did. The district court disagreed, and Amazon has not disputed that finding on appeal. And so that squarely forecloses Amazon's equitable claims as to Mr. Nelson and Mr. Kirshner, and with respect to Mr. Watson, I think the critical difference between the posture of this case now and when this case was on appeal previously, as this court emphasized, in its complaint, the operative complaint during the PI appeal, Amazon argued that Mr. Watson was liable not just on the leases but on the direct purchase. And the district court concluded, after hearing evidence on summary judgment, that there is no evidence to support that. And Amazon hasn't seriously disputed that on appeal. And so now the only contracts that form the basis of Amazon's unjust enrichment claim are the leases. Those leases cover this conduct, as Amazon previously argued. It bars its unjust enrichment claim, its equitable claims. All right. Thank you, Mr. Hudson. Ms. Palmer, have you got something to add? Good morning. May it please the Court? I'm Julie Palmer, and I represent Rodney Atherton. In addition to adopting Mr. Hudson's arguments, I want to address the district court's ruling on the intercorporate immunity doctrine. The district court correctly held that that doctrine barred Amazon's claim for civil conspiracy against Mr. Atherton under Virginia law. In the first instance, the district court correctly held that Amazon... So if an attorney engages in a criminal conspiracy, even though if that is an aid of one of his clients, do you say they're immune from a conspiracy action? Well, I think the question is, does the doctrine apply? And the way that the courts have looked at this exception is, were the acts of the attorney authorized by the client? So if those actions were authorized, then yes. I believe the doctrine, as the Virginia Supreme Court has set it forward, doesn't apply. Right, but isn't that a factual question as to what the lawyer did and that the evidence is in conflict on whether or not he was acting solely as counsel for his clients or whether he was an active participant in a fraudulent transaction for which he made money? I think we need to separate out the RICO conspiracy claim from the Virginia law conspiracy claim because what the district court applied the intercorporate immunity doctrine to was the Virginia law civil conspiracy claim. That's what was in the district court's opinion and that's what Amazon is appealing. There is case law that addresses in the RICO context whether an attorney's actions go beyond the bounds of proper attorney conduct so as to turn them into potential liability for RICO. That's not what the court ruled upon. The court didn't apply the intercorporate immunity doctrine to the RICO claims against Mr. Atherton. It ordered summary judgment in his favor based upon all the other reasons. It actually never addressed the argument about whether the allegations or the evidence of what Mr. Atherton did crossed that line from attorney conduct over into fraudulent or criminal conduct. Isn't that the issue? Not as to the civil conspiracy claim under Virginia law. The sole issue there is whether there is evidence that Mr. Atherton conspired with anyone other than his clients because a principal cannot conspire with his agent, an attorney cannot conspire with his client. Amazon points to two potential exceptions to that rule before this court. Importantly, they never press those issues before the district court nor did the district court pass upon the application of either of these two exceptions. So the district court properly held that the intercorporate immunity doctrine applied and Amazon did not preserve that question for appeal. If, however, this court were to get to the merits of that, neither exception applies to Mr. Atherton's conduct in this case. First of all, as to the outside of the scope of his attorney conduct, this court has never recognized such an exception to the intercorporate immunity doctrine. Moreover, all of the allegations that Amazon put forward with regard to Mr. Atherton did relate to his conduct as an attorney. That was what was alleged in the third amended complaint. And it was also, importantly, there was no evidence of the contrary presented to the district court at summary judgment. For those additional reasons, we ask that you affirm the district court. All right. Thank you very much. Mr. Hunger, you've got some rebuttal time. Thank you, Your Honor. Several briefly brief points. First of all, counsel argued that the lease continuity agreement affirmed the leases. That's not correct. In fact, what the lease continuity agreement did was terminate any involvement by Watson and Northstar. They had never been parties to the leases, but whatever connection they had was terminated by pursuant to the lease continuity agreement where IPI, the entity that provided the funding for the leases, and Amazon agreed that Watson and Northstar would be terminated because of their fraud. So to the extent rescission is even relevant, since they weren't even parties in the first place, their relationship was agreed to be terminated by virtue of that agreement. We do dispute that Watson, counsel claimed that we concede that Watson had no involvement in either of the purchase transactions. That's simply not true, as I argued before. Watson pocketed $5 million out of the White Peaks transaction on the ground, as he claimed that he was entitled to share in the illicit proceeds because his employees had negotiated that deal, and he got $5 million. The Bear case is completely inapposite here. The counsel argues that there were overpayments alleged in that case. To the contrary, this court said in Bear, and I quote from page 254, the Bears do not contend that they were harmed by being overcharged for settlement services, close quote. So both for that reason and because as the court went out of its way to say in Bear there was no fiduciary duty at issue in that case, that case is completely inapposite since this case does involve breaches of the fiduciary duty of loyalty owed by Nelson and Kirchner to their employer. On the KBC rebates, I already explained why our supplemental disclosures identified the very $5.1 million transferred from Northstar to Villanova that were being claimed as monetary harm and that it is undisputed, includes the rebate amount, and defendants well knew that since they're the ones who transferred, who directed that the rebates be transferred to Northstar and from Northstar to Villanova, and from Villanova through sham entities to Kirchner and Nelson. So there was no dispute. Not only did they seek discovery on that question before fact discovery closed, the expert, the damages expert that we, our damages expert report explicitly addresses the KBC issue at pages 2433 to 35 and 2472 of the joint appendix. It deposed him on that very issue at length as we've shown in the brief. So there was zero surprise, zero prejudice, zero basis for excluding that evidence. On damages, as I said before, counsel here today at oral argument is trying to offer a belated defense claiming that in fact there's no evidence of a connection between the fraudulent conduct and inflated costs separate and apart from the kickbacks. As I said in my opening remarks, we went through all of that in our opening brief at pages 8 to 10 and 24 to 26, citing record evidence in great detail showing the various ways in which the fraudulent conduct of the co-conspirators inflated the budgets, the leasing fees, the yield rates, and other expenditures that were built into the budget amounts that then the yield rate was applied to to determine Amazon's rent. So it's unquestioned that in fact there was evidence from which the jury could find that Amazon's rents were increased by the conduct. They did not even respond to that in their appellee's brief. And for them to stand up today and claim there's no evidence we submit should not be accepted by the court. The expert, as Judge Rushing pointed out, far from conceding that there was no evidence of injury, the expert said at page 2460 of the joint appendix, having gone through the evidence that I just articulated, he said, Amazon would have been able to negotiate for lower lease rates and the overall lease budget and Amazon's rent would have been lower had the portion of Northstar's fees paid to Villanova Trust been eliminated. That is, the fraudulently increased fees. That's at page 2460. The counsel makes much about the expert's unwillingness to opine on, quote, damages. The expert was simply trying to avoid opining on a question for the jury, to avoid a dauber challenge that he was opining on something beyond his expertise. What he said was, repeatedly, and his opinion, his ultimate opinion is, Amazon suffered economic injury to the tune of many millions of dollars. Economic injury is the basis to get to the jury. Counsel argued that we somehow waived the fraud argument. That's simply not correct. If the court looks at pages 624 to 625 and 630 to 633 of the joint appendix, that's excerpts from our summary judgment opposition, we articulated our fundamental point at 624 to 625 that both fraud and RICO injury are established by kickbacks as well as by the other evidence that I've articulated. And then we articulated, we went through in greater detail in the RICO section at 630 to 633 addressing all of the other side's arguments. It's true we didn't cite every single case they cite and go through them case by case, but we said their state law cases are irrelevant because those are all, as I said before, mere simple real estate purchases where there was a misrepresentation about some of the quality of the land being purchased. It wasn't a commercial bribery case, and so they're inapposite. We didn't reiterate all of that in the fraud section. It's true because it had already been set forth. The district judge was well aware of our arguments and proceeded to explain in great detail on the merits why he thought our position was wrong on fraud. So there was no waiver and the judgment should be reversed. I think the final point I wanted to address was on the equity claim, the equity arguments. Raymond, this court's decision in Raymond says that a contract will foreclose unjust enrichment claims if the parties expressly delineated the contractual obligations the two will have on the subject in question. The agreements with the employees say nothing about fraud, fiduciary duty. They're not employment agreements. They don't specify the terms and conditions of employment, other than the limited issues they address. They don't specify the duties of the employees. They don't specify the salaries and benefits. They simply don't cover the conduct at issue here, and not even the district court said that they did. For all those reasons, we ask that the judgment be reversed. Before you sit down, what do you say is the factual dispute with regard to the attorney Atherton? What takes that out of the summary judgment category and makes it a jury issue? The factual dispute is whether the attorney was acting within the scope of his employment as an attorney, that is, actually providing bona fide legal representation and bona fide legal advice, or instead had become a participant in the fraud and conspiracy. And as this court said, the counsel said there's no case recognizing, but it's simply not true, both the Virginia court in the CGI, sorry, different definition, so the Virginia court in the PGS case that we cite in our brief, the Virginia circuit court, and this court in the Farrell case, recognize that a lawyer who is not providing bona fide legal representation, acting truly as a lawyer, but instead is participating in illicit conduct, is not, can become a co-conspirator, because they're acting outside the scope of a bona fide attorney-client relationship. That's the factual issue for the jury to decide. All right. Thank you. Thank you very much. All right. Well, obviously Judge Rushing can't come down and shake your hand, but Judge Floyd and I will.
judges: G. Steven Agee, Allison J. Rushing, Henry F. Floyd